**Donald DYER, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 6133.**

Court of Appeals of Alaska.

July 1, 1983.

Richard Yospin, Asst. Public Defender, Ketchikan, and Dana Fabe, Public Defender, Anchorage, for appellant.

Charles M. Merriner, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Donald Dyer was convicted of assault with a dangerous weapon, former AS 11.-15.220.[1] Judge Duane Craske sentenced Dyer to eight years' imprisonment. Dyer appeals his conviction and sentence to this court. We affirm.

Wrangell resident Robert Seimears was a twenty-five-year old deckhand living on the tugboat May in July of 1979. About 10:00 or 11:00 p.m. on the night of July 29, Seimears was speeding through the harbor with his girlfriend in his thirteen-foot skiff, making swells. He had been "drinking quite a bit at the time." His actions disturbed Steven Hodges, who while standing on a dock, shot at Seimears' boat with a .22 caliber rifle. Seimears then confronted Hodges, took the rifle away from him,

---

1. Former AS 11.15.220 stated:

 *Assault with a dangerous weapon.* A person armed with a dangerous weapon, who assaults another with the weapon, is punishable by imprisonment in the penitentiary for not more than 10 years nor less than six months, or by imprisonment in jail for not more than one year nor less than one month, or by a fine of not more than $1,000 nor less than $100.

ejected the shells, and threw the rifle down on the dock. Hodges ran away.

On the night of July 30, after playing pool and drinking at Wrangell's "Brig" bar, Seimears took his skiff to the May to pick up more cash. On his way back across the harbor, he decided to go talk to Hodges. He erroneously thought that Hodges was staying aboard Donald Dyer's boat, the forty-two foot troller "Green Hornet." Dyer was a fifty-year old fisherman and heavy equipment operator who was living aboard his boat. Seimears did not know him by name.

According to Seimears, at about 10:30 or 11:00 p.m. he pulled up alongside of the Green Hornet. Leaving his motor running, he stepped from his skiff onto Dyer's unlighted boat. Seimears was bent over, tying a mooring line when he saw a flash from the Green Hornet's cabin and felt a sharp blow to his abdomen. Dyer had shot him with a .357 caliber revolver. Seimears fell into his skiff, and attempted to disconnect the mooring line to leave. However, Dyer allegedly attempted to pull Seimears out of the boat and force him under water. At this point, Seimears got a good look at Dyer's face. Seimears escaped and steered his boat back to the May. He fell into the water but was rescued by the May's captain. The next thing Seimears remembered was waking up in a Seattle hospital.

Seimears lost parts of his intestines, pancreas and liver, and remained in the hospital for over two months. His right kidney and his stomach were also damaged. He underwent four operations, and his recovery was difficult.

At the preliminary hearing, Seimears admittedly lied to the court. He stated that he had only tied his boat to the Green Hornet so that he could walk across it to the dock, and he denied that he went to the Green Hornet to find Hodges. He later said that he lied because he was afraid that if he told the truth Dyer might not be convicted.

Dyer's trial testimony presented a substantially different version of the shooting. According to Dyer, at about 11:00 p.m., he was seated alone in the Green Hornet's cabin, having a few drinks before going to bed. Something bumped against his boat, and he saw a man looking through his window. Seimears, a total stranger to Dyer, came into the cabin and accused Dyer of being a friend of Hodges. Dyer told him to leave. Seimears put his hand into his coat pocket; Dyer thought he saw the outline of a gun barrel in the pocket and was afraid that Seimears was going to shoot him. Dyer shot Seimears. Seimears fell onto the floor, but he got up and left in his boat.

After the shooting, Dyer quickly started up the Green Hornet and left Wrangell, traveling north. Dyer claimed that on August 10 the Green Hornet sank in Chatham Strait after hitting a rock. He rowed a skiff ashore, and flew from Tenakee to Juneau, and then to Oregon, under an assumed name. Even though there was a warrant out for his arrest, he later returned to Alaska. He was arrested in Fairbanks on November 18, 1980. The police were unable to locate Hodges, who left Wrangell shortly after the shooting.

The prosecution first charged Dyer with assault with a dangerous weapon, but then indicted him for shooting with intent to kill, wound or maim. Dyer was convicted of the originally charged offense.

## THE INDICTMENT

Dyer first argues that trial judge Duane Craske erred in not dismissing the indictment. Dyer argues that Judge Craske erred on two grounds: first, that he should have dismissed the indictment because of vindictive prosecution; and second, that he should have dismissed the indictment because of the prosecution's failure to present exculpatory evidence to the grand jury.

### Vindictive Prosecution

The prosecution originally charged Dyer in a felony complaint filed on July 31, 1979, with committing an assault with a dangerous weapon on July 30. Dyer fled Wrangell and the charge remained unchanged during the nearly sixteen months he remained a fugitive, during the preliminary hearing on

November 20, 1980, and for about six weeks after the preliminary hearing until Dyer was indicted on January 8, 1981. After the preliminary hearing, Dyer refused the prosecution's request to waive grand jury indictment, but there was no discussion between Dyer and the prosecution as to what might be the consequences of refusal. Both parties agree that at no time did the prosecution inform or threaten Dyer that it was considering asking the grand jury to indict him on the greater charge of shooting with intent to kill, wound or maim. Former AS 11.15.150. After the grand jury indicted Dyer on the greater charge, his attorney claimed that the indictment was vindictive, in retaliation for the refusal to waive Dyer's constitutional right to grand jury indictment. Alaska Const. art. I, § 8. The prosecution denied this charge.

■ Vindictive prosecution violates a defendant's constitutional rights to due process. U.S. Const. amend. XIV, § 1; Alaska Const. art. I, § 7. The trial court recognized that the prosecutorial "function cannot be exercised in a manner that would chill or discourage the [exercise of the] right[s] of a defendant." The court found that in this case, however, the increased charge of shooting with intent to kill, wound or maim was based upon District Attorney Victor Krumm's good faith reassessment of an assistant district attorney's lesser charge, after hearing the victim's preliminary hearing testimony. The trial judge found that at the time the assistant district attorney filed the assault with a deadly weapon charge, he had not yet learned that Seimears claimed that after Dyer had shot him, Dyer had attempted to pull Seimears out of his skiff and push him under water. The prosecution learned this information a few days later. The complaint lay dormant while Dyer remained a fugitive. The court found there were two reasons why reassessment after the preliminary hearing was not unreasonable. First, the court termed the preliminary hearing testimony of Seimears "new evidence." The court reasoned that even though the prosecutor knew the probable content of Seimears' testimony before he testified, it was only after he testified that the prosecutor actually had the victim's in-court testimony and was able to judge his demeanor while testifying before the court. Second, as the court noted "because of the practical fact that all of us have so many criminal matters that we are concerned with ... it is a normal and non-prejudicial thing for an assessment to take place at certain critical junctures of the criminal justice system" such as after a preliminary hearing. In addition, the court noted the policy argument that if good faith pretrial charge reassessments were prohibited as "vindictive prosecution," the state would overcharge defendants to escape the possibility of having to reassess charges upward at a later date.

The trial court's ruling denying Dyer's prosecutorial vindictiveness claim is supported by *United States v. Goodwin*, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982). Goodwin was charged with several traffic and misdemeanor offenses after he struck a federal officer with his car and eluded the officer in a high speed chase. After arrest and arraignment, he fled the jurisdiction and was not located until three years later. He entered into plea negotiations, but later demanded a jury trial. A second prosecutor reassessed the case, and significantly raised the charges by obtaining a felony indictment. 102 S.Ct. 2488, 73 L.Ed.2d at 79.

*Goodwin* held that courts should make a distinction between pretrial and post-trial prosecutorial vindictiveness claims. The Court said that even in the absence of evidence of bad faith or malice, a presumption of vindictiveness should be applied to post-trial prosecutorial actions adverse to defendants' exercise of their rights. This presumption could be overcome only by objective evidence justifying the prosecution's actions. However, the Court held that it would not apply such a presumption in evaluating a prosecutor's pretrial charge increase after a defendant's demand for a jury trial. The prosecutor "should remain free before trial to exercise the broad discretion entrusted to him .... An initial decision should not freeze future conduct. Moreover, there are certain advantages in avoiding a rule that would compel prosecu-

tors to attempt to place every conceivable charge against an individual on the public record from the outset." 102 S.Ct. at 2493 & n. 14, 73 L.Ed.2d at 86 & n. 14; *see* Note, *Prosecutorial Vindictiveness in the Criminal Appellate Process: Due Process Protection After United States v. Goodwin,* 81 Mich.L. Rev. 194, 213 (1982).

We find that the policy arguments set forth in *Goodwin* that the prosecution must have some freedom to adjust charges upward are persuasive, at least when the change in the charges is made prior to or at the time of the initial indictment.[2] The instant case does not require us to decide whether we would adopt the *Goodwin* pretrial versus post-trial standards.

 We see no reason to apply a presumption that assumes that vindictive prosecution has taken place when charges are increased prior to or at the time of the original indictment. Without a presumption that the increase in charges was the result of prosecutorial vindictiveness, we conclude that the trial court's finding that the prosecution did not vindictively increase Dyer's charges was not erroneous. In the instant case the prosecution only asked if Dyer would waive grand jury indictment; it is undisputed that it made no mention whatsoever of any adverse consequences should Dyer decline to do so. Also, the increased charge was supported by the evidence available to the prosecution. As the trial judge stated, the only relationship that was established between Dyer's exercise of his right to be indicted by grand jury and the increased charge was that they followed in sequence. We find no error.[3]

## Exculpatory Evidence

 Dyer next alleges that the prosecutor violated his duty to present exculpatory

**2.** Smaltz, *Due Process Limitations on Prosecutorial Discretion in Re-charging Defendants: Pearce to Blackledge to Bordenkircher,* 36 Wash. & Lee L.Rev. 347, 353 (1979), *cited in Atchak v. State,* 640 P.2d 135, 144 (Alaska App.1981).

The rule that emerges from the Supreme Court's decisions in [*North Carolina v.*] *Pearce* [395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656] and *Blackledge* [*v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628] is that the due process clause prohibits the state from retaliating against a defendant's exercise of constitutional or statutory rights. Because the mere appearance of vindictiveness may deter a defendant from challenging the lawfulness of his conviction, due process concepts prohibit the state from 'upping the ante.' The rule applies whenever the prosecution has knowledge of the facts essential to the more serious charge *at the time of the original indictment.* The good faith or bad faith of the prosecutor is irrelevant and it is not necessary for the defendant to show actual vindictiveness. Absent an adequate justification for the superseding or additional charges, vindictiveness will be presumed. [Emphasis added.]

**3.** *Atchak v. State,* 640 P.2d 135 (Alaska App. 1981), cited by Dyer in support of his position, is distinguishable from the instant case. Atchak was originally indicted for negligent homicide and four counts of failing to render aid after he was involved in a motor vehicle accident in which five people were injured, one fatally. *Id.* at 140. Several months later the state dismissed the negligent homicide charge and one of the counts of failure to render aid. Several months after that, Atchak filed a motion to dismiss the three remaining counts of failure to render aid. The prosecutor indicated that if the court granted the motion to dismiss the indictment he would consider reindicting Atchak on the original charges, including the negligent homicide charge. The defense attorney withdrew his motion to dismiss the indictment, indicating that he did not want his client to be reindicted on the negligent homicide charge. The district attorney then reindicted Atchak on five counts of failure to render aid. The defense attorney indicated that he would not file a motion to dismiss this indictment because the prosecutor indicated if such a motion was filed he would probably reindict on the original charges, including the manslaughter charge. The prosecutor indicated he wished to discourage the filing of such a motion, since if the motion was successful Atchak's trial would be continued. *Id.* at 141.

*Atchak* involved a situation which occurred long after the original indictment. Although Atchak had been originally charged with negligent homicide, that charge had been dismissed for approximately five months at the time the prosecutor threatened to reindict on that charge. *Id.* at 150. *Atchak* also involved a clear example of giving the right to attack a grand jury indictment, in response to a specifically communicated prosecution threat to indict on a greater charge if the indictment was dismissed. Also in *Atchak* the state conceded that Atchak had established a prima facie case of vindictiveness and argued exclusively that the appearance of vindictiveness had been re-

evidence to the grand jury by not completely presenting the extent of Seimears' admitted perjury and by not revealing that some of Seimears' grand jury and preliminary hearing testimony was inconsistent with information known to the prosecution. It is clear that the prosecution "has a duty to present exculpatory evidence to the grand jury pursuant to Criminal Rule 6(q)." *McMahan v. State,* 617 P.2d 494, 501 (Alaska 1980), (citation omitted), *cert. denied,* 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981). However, the "prosecutor's obligation to present [such evidence] does not turn the prosecutor into a defense attorney; the prosecutor does not have to develop evidence for the defendant and present every lead possibly favorable to the defendant." *Frink v. State,* 597 P.2d 154, 166 (Alaska 1979).

■ At the preliminary hearing Seimears testified that he tied up to Dyer's boat by chance, just to walk across the deck. He implied that he could not tie up his boat directly to the dock, because the open portion of the dock would have been dry since the tide was going out. On November 27, 1980, Seimears apparently repeated his false preliminary hearing testimony to Investigator Dennis Gardner. It was not until December 12 that he changed his story. Seimears admitted to the grand jury that he lied in his preliminary hearing testimony. He stated before the grand jury that he actually boarded the boat because he thought that Steven Hodges, the man who had earlier fired a shot at his boat, resided there. He told the grand jury that he lied because he was afraid that Dyer might "get off" if he told the truth. Dyer's contention is that the prosecution did not reveal the full extent of Seimears' perjury by showing that Seimears had also lied to the police and had consciously fabricated a story to minimize the reasons why he boarded Dyer's boat.

Dyer further points to several unrevealed inconsistencies in Seimears' grand jury testimony: a) Seimears stated to the grand jury that he had left his boat's motor running when he boarded the Green Hornet. At the preliminary hearing he had implied that he started the motor after he had been shot; b) Seimears stated at the preliminary hearing that he had not kept a pistol on the May at the time of the shooting. Yet he had apparently [4] told Investigator Gardner on November 27, 1980, that he had two .357 magnum revolvers in a locker on the May at the time of the shooting. On December 12, 1980, a May crewman apparently told Gardner that he had cleaned out Seimears' locker after the shooting and had found more than one handgun. Since Seimears claimed that he had not taken a gun with him to the Green Hornet, Dyer contends that the grand jury should have been informed that Seimears had access to handguns immediately before boarding the Green Hornet. c) At the preliminary hearing Seimears claimed to have had no ill will toward Hodges at the time of Dyer's attack. However, William Privett apparently gave a statement to the Wrangell police on November 26, 1980, stating that before the Dyer incident Seimears had indicated that he was still angry at Hodges. Dyer contends that this would have provided evidence to the grand jury that Seimears went on board the Green Hornet to threaten or attack Hodges, not merely to talk to him; d) According to police reports, Seimears apparently consumed five beers the night of the shooting. At the grand jury hearing, Seimears testified that he had consumed two or three beers, "that's about it." e) At the preliminary hearing Seimears testified that the evening of the shooting he had been playing pool with Duane Evans and some other men. Dyer claims Evans gave a statement to the Wrangell police on No-

butted. *Id.* at 145. We concluded that the state had not rebutted the prima facie case of vindictiveness, and remanded the case to allow Atchak to file his motion to dismiss the indictment.

4. Dyer's brief only refers to his motion which was filed in the trial court. The police reports that assertedly support some of his contentions are not included in the record on appeal. We assume that the police reports read as Dyer has represented.

vember 27, 1980, "to the effect that on the evening of the shooting he [Evans] was 'passed out' from drinking alcohol, and was aboard his boat all night with his wife."

This issue boils down to the fact that a) the prosecution told the grand jury that Seimears had lied and the basics of the most important lies, but b) it did not fully reveal evidence of the extent of Seimears' lying, and c) it did not reveal that there was evidence indicating that Seimears had access to handguns immediately before he boarded Dyer's boat and was possibly still angry with Hodges at that time.[5] Dyer admitted at trial that he shot Seimears. Assuming the evidence in question was exculpatory, it could have been exculpatory as to the issues of whether Dyer shot in self-defense and whether Seimears was lying when he testified that after Dyer shot him, Dyer tried to pull him out of the skiff and push him under water.

The grand jury would have known that Seimears had been less truthful than he revealed had they heard this evidence. However, as to Seimears' credibility, it would have been cumulative because the grand jury already knew he was an admitted perjurer, and the fact that Seimears fabricated his prior story about having to tie up to another boat to reach a portion of the dock that would not be dry at low tide was re-emphasized when the grand jury heard the testimony of former harbormaster Hernando Villarma. Villarma's testimony established that Seimears would have had many places to tie up directly to the dock, since the harbor had been "fairly vacant" at that time. In addition, the grand jury apparently did not have much of an interest in Seimears' prior lying. It fully questioned him on other matters, but did not ask him about his perjury.

If the prosecution had neglected to reveal evidence that Seimears had a gun in his possession when he boarded the Green Hornet, Dyer would have an excellent argument. However, the evidence not revealed to the grand jury only showed that Seimears had access to guns before boarding the Green Hornet, not that he was carrying a gun. At that point, the prosecution and the grand jury did not know that Dyer would claim at trial that Seimears appeared to have a gun in his pocket. Therefore, it is questionable whether the fact that Seimears had access to guns before boarding the Green Hornet would have substantially tended to negate Dyer's guilt by making the grand jurors conclude that Dyer acted in self-defense. This type of evidence would unquestionably be brought out by a defense attorney at trial, but the prosecutor does not have to develop evidence for the defendant at the grand jury hearing. *Tookak v. State,* 648 P.2d 1018, 1021 (Alaska App.1982).

The prosecutor's failure to introduce the Privett statement also does not appear to violate the duty to present exculpatory evidence. The portion of the police report quoted by Dyer does not state when Seimears allegedly made the statement that he was angry with Hodges, other than that it was sometime between the Hodges incident and the Dyer incident. It does not show that Seimears was still angry with Hodges at the time he boarded the Green Hornet, rather than "just going to talk to him," as he testified before the grand jury. It only shows that at some point before the Dyer incident, Seimears was angry with Hodges. The grand jury could have easily inferred this much from the other testimony.

We conclude that the trial judge did not err in finding that the prosecution did not violate its duty to present exculpatory evidence to the grand jury.

---

5. The questions of whether Seimears' boat's motor was running or not running, whether Duane Evans was or was not one of the pool players that evening, and whether Seimears had two to three beers, rather than five beers, can be dismissed as insignificant inconsistencies. "The mere fact of inconsistency does not automatically convert all such evidence into exculpatory material." *Preston v. State,* 615 P.2d 594, 602 (Alaska 1980); *see also Miller v. State,* 629 P.2d 546, 548 (Alaska App.1981) (allowable for prosecutor to exclude "essentially collateral" information at grand jury hearing).

## EVIDENCE OF DYER'S FLIGHT

Dyer argues that the trial court should not have allowed the state to introduce evidence of his flight from the crime, and should not have given a jury instruction on flight.[6] He argues that admission of evidence concerning his flight violated his right against self-incrimination, and was of insufficient probative value for admission.

### Self-Incrimination

Dyer first argues that admitting evidence of his flight was error because the evidence violated his privilege against self-incrimination. U.S. Const. amend. V; Alaska Const. art. 1, § 9. Through cross-examination the state introduced substantial evidence of Dyer's flight from the crime, and then argued that Dyer's flight was inconsistent with his assertion of self-defense. The state argued that if Dyer had really acted in self-defense he would not have fled but would have reported the shooting incident to the authorities. Dyer argues that by making this argument the state was commenting on and penalizing him for his pre-arrest silence, and that by arguing this inference from the evidence the state forces a person in Dyer's position who has been involved in a shooting to surrender to the authorities and incriminate himself. He cites *Dorman v. State,* 622 P.2d 448 (Alaska 1981), *Padgett v. State,* 590 P.2d 432 (Alaska 1979), and *Bargas v. State,* 489 P.2d 130 (Alaska 1971). In *Bargas* the supreme court held that the fact that Bargas did not consent to allow a police officer to search him and then ran from the police officer was not admissible. The court stated:

> [T]he fact is that appellant's flight was inextricably related to his refusal to submit to an illegal search. Appellant's refusal to submit to that search . . . and his running away, signified guilt no more clearly than it did a natural desire to

repel an unauthorized intrusion of his right to privacy.

489 P.2d at 133 (footnote omitted). In *Padgett,* the court again held that the prosecution could not admit evidence of a defendant's refusal to allow a warrantless search, finding *Bargas* "directly dispositive." The right to refuse to authorize a search "would be effectively destroyed if, when exercised, it could be used as evidence of guilt." 590 P.2d at 434. In *Dorman,* the court found that prosecutorial comment "that the jury should infer guilt from the fact that Dorman remained silent between the time of his arrest and the time he was advised of his *Miranda* rights" violated Dorman's right to remain silent. 622 P.2d at 456–59.

In *Elson v. State,* 659 P.2d 1195, (Alaska 1983), the supreme court clarified the reach of the *Bargas* and *Padgett* cases. The court held that, whether a search was a legal search or an illegal search, a person's peaceful refusal to allow the search was not admissible as evidence. Admitting evidence of a refusal to allow a search might inhibit the right to refuse to consent to an illegal search. *Id.* at 1199. However evidence that Elson physically resisted a search by grabbing the hand of a state trooper who was about to search his pocket was allowed. The pocket contained cocaine and the evidence was probative to show Elson knew he had cocaine in the pocket. The court reasoned that there was no need to encourage physical resistance to peaceful searches and held that evidence that Elson physically resisted the search did not violate Elson's rights under the fourth amendment to the United States Constitution or article 1, § 14 of the Alaska Constitution.[7] It is important to note that *Bargas, Padgett, Dorman* and *Elson* all involved defendants who were in police custody or temporarily detained by the police. They are distinguishable from

---

6. The state claims that the jury instruction is not an issue on appeal. This claim is erroneous. Dyer objected to the instruction at trial, the instruction is contained verbatim in the trial transcript, and point twelve of Dyer's points of appeal states: "The court erred in giving an instruction concerning 'flight of the accused.' "

7. It appears the supreme court did not consider Elson's claim under the fifth amendment or article 1, § 9 of the Alaska Constitution. *But cf.* 659 P.2d at 1199 n. 15 (police should not be allowed to bait defendant into refusing consent to search and thereby incriminating himself).

cases like Dyer's which involve evasion of police custody.

■ *Jenkins v. Anderson,* 447 U.S. 231, 234, 100 S.Ct. 2124, 2127, 65 L.Ed.2d 86, 92 (1980), establishes that, at least under the United States Constitution, a defendant's pre-arrest flight or silence may be used as evidence. In *Jenkins,* a murder defendant took the stand and asserted that he was acting in self-defense. On cross-examination, the prosecution questioned him on the fact that he was not apprehended until two weeks after the incident. In closing argument, the prosecution referred to the defendant's pre-arrest silence to impeach his credibility, arguing that the defendant would not have fled and would have reported the incident to the police if he really had acted in self-defense. The Court held that pre-arrest silence could be used to impeach the defendant's credibility and that the prosecution did not violate the fifth amendment by using the prearrest silence to impeach the defendant after he took the stand. *Accord Weir v. Fletcher,* 658 F.2d 1126, 1129 (6th Cir.1981), *rev'd on other grounds,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982).

The Court recognized that this holding could tend to force suspects facing arrest to speak unless they were willing to have their pre-arrest silence later used to impeach them. "But the Constitution does not forbid 'every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights,'" 447 U.S. at 236, 100 S.Ct. at 2128, 65 L.Ed.2d at 93 (quoting *Chaffin v. Stynchcombe,* 412 U.S. 17, 30, 93 S.Ct. 1977, 1984, 36 L.Ed.2d 714, 725 (1973)), especially when such cross-examination could "enhance the reliability of the criminal process." *Id.* 447 U.S. at 238, 100 S.Ct. at 2129, 65 L.Ed.2d at 94.[8]

We conclude that we should follow the reasoning of the Supreme Court in *Jenkins* in this case. In reaching this decision we do not mean to imply that in all cases pre-arrest silence or conduct which demonstrates consciousness of guilt is admissible. We note that in Dyer's case the evidence which

---

8. In Dyer's case, a small amount of the pre-arrest silence evidence did come in during the prosecution's case-in-chief, rather than by way of impeachment. The *Jenkins* opinion left undecided the issue of whether the prosecution could have used the defendant's pre-arrest silence in its case-in-chief. *See* Note, *Impeachment Use of Prearrest Silence Violates Neither the Privilege Against Compulsory Self-Incrimination Nor the Fundamental Fairness Guarantee of the Due Process Clause,* 58 U.Det.J. Urb.L. 307, 316 (1980–81). However, Justice Stevens's concurring opinion (joined in relevant part, by Justice Stewart) concluded that this use of pre-arrest silence presented no fifth amendment issue because the defendant's silence occurred before he had any contact with the police. "I would simply hold that the admissibility of petitioner's failure to come forward ... raised a routine evidentiary question that turns on the probative significance of that evidence ...." 447 U.S. at 244, 100 S.Ct. at 2132, 65 L.Ed.2d at 98 (Stevens, J., concurring). *Accord The Supreme Court, 1979 Term,* 94 Harv.L.Rev. 1, 84 (1980); Note, *Impeachment Use of Prearrest Silence Violates Neither Self-Incrimination Clause of Fifth Amendment Nor Due Process Component of Fourteenth Amendment—Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), 54 Temp.L.Q. 331, 350–51 (1981). At least two post-*Jenkins* opinions have considered the issue of whether *Jenkins* should be extended to the prosecution's case-in-chief. Both agree with the Stevens-Stewart concurrence. *United States v. Robinson,* 523 F.Supp. 1006, 1011 (E.D.N.Y. 1981), *aff'd mem.,* 685 F.2d 427 (2d Cir.1982); *State v. Helgeson,* 303 N.W.2d 342, 347 (N.D. 1981).

This court does not need to decide whether to extend *Jenkins.* The state's detailed evidence concerning Dyer's flight and pre-arrest silence was mostly garnered during his cross-examination. As Dyer admits, "in the State's case, there was no actual evidence of flight other than that Mr. Dyer was not present at a time that the police were looking for him...." Even if the minor evidence indicating pre-arrest silence in the prosecution's case-in-chief was in error, we conclude it was harmless error. Dyer took the stand to give his self-defense version of the shooting even though he knew the state would extensively cross-examine him on his flight. Evidence indicating pre-arrest silence presented in the state's case-in-chief could have been presented as rebuttal evidence subsequent to Dyer's testimony. *See United States v. Caro,* 637 F.2d 869, 876 (2d Cir.1981) (even if erroneous for prosecutor to introduce evidence of suspect's silence, error harmless beyond reasonable doubt because evidence could have been introduced in rebuttal after defendant testified).

was offered to show his consciousness of guilt emphasized his physical conduct, his flight after the shooting. Dyer's flight from the scene of the crime, to the extent that the evidence is probative, involves the facts surrounding the crime and reasonable inferences which can be drawn from those facts. A trial is a search for truth and unless there are strong policy reasons to do so the jury should not be precluded from hearing relevant facts. Just as our supreme court concluded that there was no policy reason to protect Elson's right to physically resist a search, we see no reason to protect Dyer's right to flee from the scene of a shooting and evade the authorities.

We conclude that Dyer's fifth amendment rights were not violated when the trial court allowed introduction of evidence of his flight. We do not reach a different result under article I, § 9 of the Alaska Constitution.

### Probative Value

Dyer argues that the trial court erred in admitting evidence of his flight because the probative value of the evidence of flight was outweighed by the danger of unfair prejudice. A.R.E. 403.[9]

Prior to trial, Dyer moved for a protective order requesting that "counsel for the State be instructed to refrain from questions designed to produce answers relating to any alleged flight from the scene of the alleged crime . . . ." The state established through Dyer's testimony at trial that Dyer knew that he had shot Seimears and saw "quite a bit" of blood on his boat the next day, yet did not contact anyone on his radio; that he "presumed" the authorities were looking for him; that he hid out in different harbors and bays during the day and travelled at night; that he did not notify the Coast Guard or any other authorities that his documented boat had sunk and that he flew under a false name on his flights from Tenakee to Juneau and from Juneau to Oregon.

Dyer argues that evidence of his flight was not probative of his guilt for several reasons: on the day of the shooting Dyer had told a trial witness, Callie Marriot, that he intended to leave port to go fishing at 6:00 a.m. the following morning; Dyer feared reprisal by Seimears or his friends and wanted to leave to protect his personal safety; it was questionable whether Dyer was aware of the extent of Seimears' injuries; and Dyer may have fled because he committed the additional crime of felon-in-possession of a concealable firearm. The felon-in-possession crime decreased the probative value of using the flight to show Dyer's "guilty knowledge" of the assault. It additionally put him in the position of having to admit that he was a convicted felon if he desired to argue this point to the jury. He decided not to reveal his convicted felon status. In answer to these arguments, however, on cross-examination Dyer admitted that he did not do any fishing after the shooting. The fact that Dyer may have fled out of fear for his safety does decrease the probative value of using his flight to help prove that he knew he had committed the crime. Dyer was able to explain his asserted fear of reprisal at trial and his attorney was able to make this argument to the jury. As stated above, the state established that Dyer knew he had hit Seimears with a bullet from his .357 revolver, and that he found Seimears' blood on his boat the next day. In addition, Dyer prayed for Seimears and thought "quite a bit" about whether Seimears had lived or died.

The supreme court has indicated that the probative value of evidence of flight is often weak. Most recently, in the *Elson* case the court discussed the use of flight to show consciousness of guilt:

> the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

---

9. A.R.E. 403 provides:
 *Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.*
 Although relevant, evidence may be excluded if its probative value is outweighed by

The conduct or demeanor of an accused at the time of arrest, which indicates a consciousness of guilt, has been held to be admissible as an implied admission. *People v. Cramer* [67 Cal.2d 127, 60 Cal.Rptr. 230], 429 P.2d 582 (Cal.1967); *State v. Lee* [201 Kan. 177], 440 P.2d 562 (Kan. 1968); *Commonwealth v. Montecalvo* [367 Mass. 46], 323 N.E.2d 888 (Mass.1975). Examples of these admissions by conduct include resisting arrest, attempting to escape, assuming a disguise or alias and fleeing from the scene of the crime. [C.] McCormick, *Handbook of the Law of Evidence* § 271, at 655 (2d ed. 1972). We have expressed serious doubt, however, as to the relevancy of evidence of flight to the issue of guilt. *See Bargas v. State*, 489 P.2d at 133.

659 P.2d at 1201 n. 21. After determining that admission of the evidence that Elson physically resisted the search did not violate Elson's constitutional rights, the court weighed the probative value of the evidence against the danger of unfair prejudice. *Id.* at 1201. The court recognized that the balancing the probative value of the evidence against the prejudicial effect in the first instance was within the discretion of the trial court and that the trial court's ruling was reversible only for an abuse of discretion. A.R.E. 403. We believe that, following *Elson,* having earlier determined that admission of the evidence of Dyer's flight did not violate his right against self-incrimination, the next step is for us to determine whether the trial court abused its discretion in determining that the probative value of Dyer's flight outweighed the danger of unfair prejudice. We conclude that the trial court did not abuse its discretion. Dyer's flight and elaborate attempts to evade the authorities could be interpreted as evidence that he had not shot in self-defense and to show his consciousness of guilt. There were certainly other possible explanations for Dyer's flight, and Dyer was able to argue those alternative explanations to the jury. As the supreme court concluded in *Elson,* the alternative explanations for Dyer's conduct "go to the weight rather than the admissibility of the evidence." *Id.* at 1201.

Dyer also objected to the instruction that the trial court gave on flight. The instruction read:

The flight of a person immediately after the commission of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such evidence is entitled is a matter for the jury to determine.

The instruction merely tells the jury that it can consider evidence of flight if it wishes and that it should give such evidence the weight which it deems appropriate. Although we are not sure any instruction on flight was necessary, we find that the court did not err in giving this instruction.

## PROTECTIVE ORDERS

■ Dyer next argues that the trial judge erred in granting protective orders which prevented Dyer from asking Seimears about charges that were pending against him at the time of trial, and about prior alcoholism and convictions for driving while intoxicated.

### Pending Charges

About twenty-one months after the Dyer incident, Seimears was charged with two criminal violations: AS 11.61.210(a)(1) (class A misdemeanor; misconduct involving weapons in the second degree, to wit: knowingly possessing a shotgun while intoxicated); and former AS 11.15.220 (class C felony; assault with dangerous weapon, to wit: pointing the shotgun at two persons in the Panhandle Trailer Court in Wrangell). Dyer wanted to fully cross-examine Seimears about these charges, which were pending at the time of trial, in order to demonstrate Seimears' alleged bias toward the prosecution. Dyer argues that the trial court's failure to allow him to fully cross-examine Seimears regarding the charges violated his right to confrontation. U.S. Const. amend. VI; Alaska Const. art. I, § 11.

The trial judge allowed Dyer to cross-examine Seimears regarding the fact that he was charged with a class C felony and a class A misdemeanor, that Seimears thought that if he were proven guilty of these charges he probably would "have to go to jail," that the felony charge carried a possible penalty of five years imprisonment, and that the attorney prosecuting Dyer or the prosecutor's colleague would prosecute the charges pending against Seimears. The trial judge reasoned that Seimears' possible bias in favor of the prosecution could be adequately shown without getting into the exact nature of the charges. We conclude that the trial judge did not abuse his discretion by limiting Dyer in his inquiry. Seimears' bias in favor of the prosecution was adequately demonstrated without showing the exact nature of the charges.

On appeal Dyer has advanced additional grounds for why the trial judge erred in preventing him from showing the facts of the charges that Seimears was facing. Dyer argues that the state placed evidence of Seimears' character for peacefulness in issue and that he should have been permitted to rebut this evidence. He also argues that the evidence should have been admitted to prove a relevant character trait of Seimears, that he was violent with guns when he was drunk and angry, and to show the absence of accident or mistake when Seimears went on board Dyer's vessel. A.R.E. 404(a)(2)[10] and A.R.E. 404(b).[11]

Dyer has not established on appeal that he ever asserted these grounds for use of this evidence in the trial court. We have independently reviewed the record and conclude that Dyer only asked to use the evidence for purposes of establishing Seimears' bias. The trial judge specifically stated that Dyer's offer and the court's ruling on these charges pertained only to the bias issue. Before trial the prosecution explicitly notified Dyer of the proper procedure for making application under Alaska Rule of Evidence 404(a)(2). Dyer's attorney stated: "The issue, very simply, is not one of character and Rule 404 has no bearing on it, except that it might if character is raised in another context. The fact that this man is charged with two criminal violations right now is an area which can be cross-examined for bias . . . ." He later stated:

I would just add that the only point that I came even remotely prepared to argue about this afternoon is the one involving bias, and Evidence Rule 404 concerns a different matter entirely . . . [T]hat may become relevant in a trial, and I can't foresee exactly what the course of the trial might be. It may become relevant and if it does I would certainly apply for an order under 404(a) . . . to allow me to go into those matters.

10. A.R.E. 404(a)(2) provides in relevant part:
(a) *Character Evidence Generally.* Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
. . . .
(2) *Character of Victim.* Evidence of a relevant trait of character of a victim of crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor, subject to the following procedure:
(i) When a party seeks to admit the evidence for any purpose, he must apply for an order of the court at any time before or during the trial or preliminary hearing.
(ii) The court shall conduct a hearing outside the presence of the jury in order to determine whether the probative value of the evidence is outweighed by the danger of unfair prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim. The hearing may be conducted *in camera* where there is a danger of unwarranted invasion of the privacy of the victim.
(iii) The court shall order what evidence may be introduced and the nature of the questions which shall be permitted.

11. A.R.E. 404(b) provides:
(b) *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

At trial, the court told Dyer "if there's something different, something, another aspect of it that you want to put on the record I will be pleased to be of help to you, but I don't want to cover the same ground." Dyer responded by making application under Alaska Rule of Evidence Rule 404 regarding Seimears' alcoholism and OMVI convictions, but did not make application under that rule concerning the subsequent assault and weapons misconduct charges.

It is not apparent from the record that the prosecution attempted to introduce any evidence of Seimears' character for peacefulness, and Dyer never offered to use the nature of Seimears' offenses on this ground. The exact nature of the charges pending against Seimears was never developed in the trial court because Dyer never made an application to the court to attack Seimears' character for peacefulness under Alaska Evidence Rule 404(a)(2) or to establish the absence of accident or mistake. Accordingly, since no application was made to the trial judge on these grounds, we conclude that Dyer may not now argue different grounds for admitting the evidence on appeal. *See Jones v. State,* 576 P.2d 997, 1001 (Alaska 1978) ("Having specified a particular purpose for the offer, Jones is not in a position to now claim error because the evidence might have been admissible on other grounds."); *cf. Brown v. Wood,* 575 P.2d 760, 766 (Alaska 1978) *modified on other grounds,* 592 P.2d 1250 (Alaska 1979) (statutory grounds for recovery not argued or ruled upon at trial will not be considered on appeal).

### Alcoholism and OMVI Convictions

Dyer next argues that the trial judge erred in granting a protective order that prevented him from impeaching Seimears by showing that before Dyer shot Seimears, Seimears was an alcoholic and had several convictions for operating a motor vehicle under the influence of alcohol.

On the first day of trial, the prosecutor asked Seimears: "What effect did [the shooting] have with respect to being questioned about the case or answering questions about it?" Seimears replied: "I just can't collect my thoughts. I have no confidence in myself, not very much, and I've turned into an alcoholic." In response to this answer, Dyer made application under Alaska Rule of Evidence 404 to introduce impeachment evidence that prior to the Dyer incident Seimears was an alcoholic who had four OMVI convictions. Judge Craske ruled that Seimears' statement was one that explained a general inability to recall the incident and concluded that the impeachment evidence that Dyer wished to introduce was collateral and would tend to . confuse the issues in the case and confuse the jury.

■ A trial judge has broad discretion in determining when the probative value of evidence is outweighed by its prejudicial impact. A.R.E. 403. This holding was not an abuse of the trial judge's discretion to regulate cross-examination. Dyer contends that the issue of when Seimears became an alcoholic was probative on two points: Seimears' general credibility; and the extent of Seimears' drinking on the night of the Dyer incident. The probative value of the evidence on both of these points does not clearly outweigh the potential for prejudice. Dyer had many opportunities to attack the general credibility of admitted perjurer Seimears. Whether Seimears was already an alcoholic at the time of the Dyer incident was only tangentially probative of how much alcohol he actually drank that particular night. We find no error.

### TESTIMONY OF DR. ORESKOVICH

Dyer argues that the trial court erred in admitting certain parts of the testimony of Dr. Michael Oreskovich, a surgeon from Seattle's Harborview Medical Center who treated Seimears after the shooting.[12] Dyer objects to the fact that during trial the court allowed Dr. Oreskovich to exam-

---

12. Dyer also contends that the court erred in admitting two photographic slides of Seimears' injuries, since they were not supplied to him by the prosecution prior to trial. We find no er-

ror, since Dyer does not demonstrate what, if any, harm resulted from admission of the slides, and the record does not show that Dyer

ine clothing that Seimears had been wearing when Dyer shot him. From this examination Dr. Oreskovich testified that Seimears was probably shot from a distance of at least ten feet. This evidence tended to contradict Dyer's testimony that Seimears was shot at close range, perhaps two to three feet.

■ Dyer contends that the prosecution violated the discovery provisions of Alaska Rule of Criminal Procedure 16(b)(1)(iv) [13] by not giving him prior notice that Dr. Oreskovich would be presenting his opinion about the distance from which Seimears had been shot. However, this is not the nature of the objection that Dyer made to this evidence in the trial court. Dyer only objected that Dr. Oreskovich was not qualified to testify about the distance at which the shooting occurred and that Seimears' coat was of questionable value as evidence because Dr. Oreskovich did not examine the coat until long after the shooting.

Accordingly, we hold that since the issue of the possible violation of Criminal Rule 16 was not raised in the trial court, Dyer has not preserved this issue for appeal.[14]

### ALLEGEDLY IMPROPER CROSS–EXAMINATION

Dyer argues that Judge Craske erred in allowing the prosecution to permit additional cross-examination after redirect examination had ended. He also contends that Judge Craske erred in not granting a mistrial after that examination. On re-redirect examination, Dyer testified that, because of the incident with Seimears, he had nightmares that Seimears was coming through the door, he was afraid to be on a boat, and he was now more easily frightened. The prosecutor then asked the following questions:

Q: Mr. Dyer, you've had a pretty rough life, haven't you, and you've been on your own all your life, and you've been able to take care of yourself, haven't you?

A: (indiscernible) yes.

Q: No, I meant—you know what I mean by take care of yourself, take care of troubles when they arise.

A: I don't fight. I walk away from a fight.

Q: · Or you fire at somebody.

A: I've never been arrested for fighting. Never.

Q: Never been arrested for fighting?

A: I can't recall ever being arrested for fighting. Maybe I'm wrong. I don't remember.

Q: Well, think back.

---

requested the remedy of a continuance when the prosecution offered the slides into evidence.

13. Alaska R.Crim.P. 16(b)(1)(iv) provides:
 *Disclosure to the Accused.*
 (1) *Information Within Possession or Control of Prosecuting Attorney.* Except as is otherwise provided as to matters not subject to disclosure and protective orders, the prosecuting attorney shall disclose the following information within his possession or control to defense counsel and make available for inspection and copying:
 . . . .
 (iv) Any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons;

14. In any event, had Dyer raised this issue in the trial court, in all probability the proper remedy would have been to grant Dyer a continuance to enable him to attempt to refute Dr.

Oreskovich's testimony. *State v. Lewis,* 632 P.2d 547 (Alaska App.1981). In *Lewis* we stated that:
 [N]umerous Alaska cases have indicated that if there is a violation of the discovery rules the appropriate remedy is generally for the trial court to grant a continuance. The leading case is *Des Jardins v. State,* 551 P.2d 181, 187 (Alaska 1976) where the court said:
 The proper procedure for a trial court faced with prosecution failure to disclose to the defense evidence that it is required to provide, until just before it plans to use such evidence, is to grant a continuance long enough to allow the defense attorney adequate time to prepare.
 *Id.* at 549 (footnote omitted). We note that Dyer never asked for a continuance or any remedy other than excluding Dr. Oreskovich's testimony. In *Lewis,* we concluded that "Alaska cases and the best policy arguments dictate that the remedy of exclusion of significant evidence should be used by the trial court only in rare situations." *Id.* at 550 (footnote omitted).

The court interrupted the questioning and allowed no more questions regarding Dyer's prior arrests. Dyer moved for a mistrial, but the court ruled that the questioning was not "significant enough to deny Mr. Dyer a fair trial," and denied the motion. Dyer did not request a curative admonition to the jury.

 First, we conclude that the trial court did not err in allowing additional cross-examination by the prosecutor. The trial court has broad discretion to control the cross-examination of witnesses. *See* 2 C. Torcia, *Wharton's Criminal Evidence* § 424, at 318–19 (13th ed. 1972). The trial court did not abuse its discretion in allowing the additional examination. 6 J. Wigmore, *Evidence* § 1897, at 741 & n. 3 (Chadbourn rev. ed. 1976). We next conclude that the trial court did not abuse its discretion in refusing to grant a mistrial. Whether or not to grant a mistrial request by a defendant is also discretionary with the court. For the court to have abused its discretion, its decision must have been clearly erroneous. *Roth v. State,* 626 P.2d 583, 585 (Alaska App.1981). Dyer argues that the prosecutor's questions clearly implied to the jury that he had formerly been arrested for assault. We find that the trial court's quick intervention, before there was even an objection by the defense, resulted in at most a vague inference that Dyer had formerly been arrested.

## ALLEGED PROSECUTORIAL COMMENT ON POST–ARREST SILENCE

Dyer next argues that the trial judge erred in allowing the prosecution to comment on Dyer's post-arrest silence by stating in closing argument: "No matter if you sit there and spend three days listening to all the other evidence and then conforming your story to it as best you can and telling only the necessary lies, the ones then can only be refuted by.... At this point Dyer objected, but the court instructed the prosecutor to proceed.

 It is unconstitutional for the prosecution to comment upon a defendant's post-advisement of *Miranda* rights silence.

*Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Dunn v. State,* 653 P.2d 1071, 1083 (Alaska App.1982). *Cf. Dorman v. State,* 622 P.2d 448, 456–57 (Alaska 1981) (plain error to comment on defendant's post-arrest, pre-*Miranda* rights silence). However, we conclude that the prosecutor's alleged reference to Dyer's post-arrest silence was so vague and indirect that it is unlikely that the jury made any connection between the prosecutor's remarks and Dyer's pretrial silence. We find no error.

## SENTENCE

Dyer contends that his sentence of eight years' imprisonment was excessive. Under former AS 11.15.220, he was subject to a maximum sentence of ten years' imprisonment.

Dyer left school to work at age thirteen, and has bitter memories of his childhood. He worked as a farmhand and cannery employee in Oregon before coming to Alaska at age twenty-nine. While in Alaska he has worked as a logger, commercial fisherman and heavy equipment operator.

Dyer was fifty-one years old at the time of sentencing. He has a fairly extensive criminal record. His present conviction is his fourth felony conviction, and the third in Alaska since 1967. In 1947, he was convicted in Oregon as a juvenile of attempted rape, assault, and damage to public property. In 1948, he was sentenced in Oregon as an adult to fifteen years' imprisonment for armed robbery. In 1958, Dyer came to Alaska. He was convicted of assault and battery in 1961, and of carrying a concealed weapon in 1966. Sentences for both crimes were suspended. In 1967, he was sentenced to five years' imprisonment for statutory rape. He received two concurrent ninety-day sentences in 1970 for two counts of furnishing liquor to a minor, and was sentenced to five years' imprisonment in 1972 for lewd and lascivious acts toward children. Dyer's presentence report states that he has received treatment at the Alaska Psychiatric Institute and the Springfield, Missouri Federal Medical Center, and cites a 1972 psychiatric evaluation. That evaluation diagnosed Dyer as a "schizoid personal-

ity." The presentence report states that Dyer is of average intelligence, "employable, articulate, imaginative and cooperative when motivated to do so." On the other hand, he is "a loner, critical of others, and suffering low tolerance to the ways and styles of others not his own."

Judge Craske noted that the jury rejected Dyer's self-defense contention. However, he found that the assault was not among the most serious conduct within the offense. Although Seimears' injuries were "very, very serious" and he was "lucky to be alive," the judge considered that Dyer was in his own home and that Seimears' assertion that he only wanted to talk "may or may not [have been] true."

The judge found Dyer to be a loner, with "an underlying, deep seated hostility" that was probably not going to change. However, he noted that Dyer might have rehabilitative potential, and that his criminal record, while serious, "does not carry forward a continuous unbroken sequence of a personality or character trait that would classify Mr. Dyer as a worst possible offender." When discussing the *Chaney* factors,[15] the court emphasized individual and general deterrence, reaffirmation of societal norms and offender isolation.

We conclude that in light of Dyer's record and the nature of the present offense, the trial judge was not clearly mistaken in imposing the eight-year sentence.[16] *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

The conviction and sentence are AFFIRMED.

**15.** *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970).

**16.** Dyer has raised two other sentencing issues. First he argues that *this court should remand* for resentencing because of unverified police contacts which were contained in a prior presentence report. We note that the record on appeal does not include the prior presentence report. The court received Dyer's prior presentence report (concerning his lewd and lascivious acts toward children conviction) in addition to the current presentence report. Dyer's counsel objected to what he considered to be unverified police contacts in the previous report. The court did not respond either affirmatively or negatively to Dyer's objection. The

sentencing court, in its sentencing remarks, clearly did not rely on these contacts in passing sentence. We find no error.

Dyer also argues that the trial court erred in denying his request for a stay of his sentence pending appeal. The court denied the stay, realizing that Dyer had fled Alaska before and was now facing a lengthy sentence. The court stated that it was "not satisfied that conditions can be imposed ... that would assure this court that the defendant would appear in court or that he would not pose a danger to the community." *See* AS 12.30.040. Given the trial court's finding, which is supported by the record, we conclude the trial court did not err in refusing to grant a stay of Dyer's sentence.