**Conrad J. WORTHY, Petitioner,**

v.

**STATE of Alaska, Respondent.**

No. S–8299.

Supreme Court of Alaska.

April 14, 2000.

---

Christine S. Schleuss, Suddock & Schleuss, Anchorage, for Petitioner.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Respondent.

Before MATTHEWS, Chief Justice, EASTAUGH and FABE, Justices.

## OPINION

EASTAUGH, Justice.

### I. *INTRODUCTION*

We reverse Conrad Worthy's conviction for second-degree sexual assault and remand for retrial. Worthy should have been permitted to introduce extrinsic evidence challenging the truth of the complaining witness's allegation that another man had raped her on a prior occasion, because her prior allegation was a crucial part of the state's case against Worthy.

### II. *FACTS AND PROCEEDINGS*

In July 1994 T.J.S. broke off her two-year romantic relationship with Worthy. But they remained in contact, and several weeks later T.J.S. agreed to dine with Worthy and another couple. On their way home from

dinner, Worthy told T.J.S. that he wanted to stop at his office because he had been having computer problems. Inside the office, Worthy and T.J.S. began to argue. The argument became violent. The details are contested, but Worthy admitted that he physically assaulted T.J.S. T.J.S. claimed that Worthy also sexually assaulted her by digitally penetrating her.

Worthy eventually let T.J.S. go. She ran to a nearby store and called the police. The police took her to a hospital, where a medical examination revealed bruising and abrasion consistent with her allegations of physical assault and digital penetration.

The state indicted Worthy for first-degree sexual assault, among other charges. At trial, the jury acquitted Worthy of first-degree sexual assault, but found him guilty of the lesser offense of second-degree sexual assault.

Worthy challenges two evidentiary rulings made by the superior court. First, it excluded testimony tending to show that T.J.S. had previously falsely alleged that another man had sexually assaulted her on an earlier occasion. T.J.S. claimed that a co-worker named Chris had sexually assaulted her in Barrow in April 1994 following a work-related party. T.J.S. reported the alleged sexual assault to the Barrow police. The district attorney never filed charges against Chris. At the time of the alleged Barrow sexual assault, T.J.S. and Worthy were dating and she discussed the incident with Worthy. Then, during the encounter between Worthy and T.J.S., Worthy mentioned Chris. T.J.S. testified that Worthy punctuated his sexual assault on her by telling her to "think of [him] as Chris." [1]

Before trial Worthy sought permission to call Chris to testify that T.J.S. had falsely accused him of rape and that T.J.S. had consented to have sex with him. The superior court refused to permit the testimony.

In its opening statement at trial, the state referred to the alleged Barrow rape and Worthy's comments regarding Chris during the assault. T.J.S. also testified on direct examination about the alleged Barrow rape and the trauma she claimed to have suffered as a result. The superior court limited cross-examination; the defense could discuss whether the sex was, in fact, consensual, and could only point out that no criminal charge resulted from the investigation.

Worthy argued before the court of appeals that the superior court's ruling improperly restricted his right to litigate the Barrow rape. Worthy maintained that once the prosecutor asserted that a prior rape had really occurred, Worthy was entitled to introduce evidence to prove that no rape had occurred.

The court of appeals rejected Worthy's argument, determining that it was essentially irrelevant whether a rape had actually occurred in Barrow. It noted that the Barrow episode was only relevant to give context to what Worthy told T.J.S. during the Anchorage incident.

Second, the superior court excluded expert testimony by Dr. Susan LaGrande, a psychologist, about the effects of childhood sexual assault upon an individual's response to and perception of violent or upsetting nonsexual incidents. Worthy offered this expert testimony on the eighth day of trial. The superior court refused to allow this testimony because Worthy had not given timely notice of his intention to call this expert, and because Worthy failed to offer any foundational evidence to suggest that the expert's theories applied to T.J.S.

The court of appeals did not consider the timeliness of Worthy's notice because it agreed that Worthy failed to establish the relevance of the expert's testimony.

Worthy petitions for hearing from the decision of the court of appeals.

### III. DISCUSSION

#### A. *It Was Reversible Error to Reject Evidence that T.J.S. Had Previously Made a False Allegation of Sexual Assault Against Another Man.*

■ The admissibility of evidence is largely within the trial court's discretion and its

---

1. On appeal, Worthy does not dispute T.J.S.'s testimony or characterization of his statements regarding Chris.

rulings will not be overturned on appeal absent an abuse of its discretion.[2]

■ Worthy argues that the superior court erred in refusing to permit extrinsic evidence that T.J.S. had falsely accused Chris of sexual assault in Barrow. The state contends that the truth or falsity of the Barrow rape is irrelevant here; the only relevant evidence was that T.J.S. discussed the incident with Worthy and that Worthy told T.J.S. during the assault to "think of [him] as Chris."

■ As a general rule, contradictory evidence may not be admitted if it relates to a collateral matter. If a matter is considered collateral, the testimony of the witness on direct or cross-examination stands—the examiner must take the witness's answer.[3] If the matter is not collateral, extrinsic evidence may be introduced disputing the witness's testimony on direct or cross-examination.

There is no clear, bright-line demarcation between collateral and non-collateral matters. In *Davenport v. State*,[4] we adopted relevancy as the dividing line; we stated that "facts which are relevant to the issues of the case [are not collateral]."[5] *McCormick on Evidence*[6] elaborated on this distinction: "the matter is non-collateral and extrinsic evidence consequently admissible if the matter is itself relevant to a fact of consequence on the historical merits of the case."[7]

Is the truth or falsity of the Barrow rape relevant to this matter? As a general rule, the prior sexual conduct of an alleged sexual assault victim is not admissible.[8] And the court of appeals has discussed an independent rule providing that an alleged victim's prior false allegations of sexual assault are not admissible to discredit the victim's current allegations unless the proponent of the evidence meets a threshold burden of establishing the falsity of the past reports.[9] But we need not decide which of these two rules applies to Chris's testimony. Because the state interjected the alleged Barrow rape into the case and made its occurrence a central part of the case against Worthy, the issue became independently relevant.

The state went much further than merely confining its evidence concerning the Barrow event to what T.J.S. had told Worthy about the incident and what Worthy had said to T.J.S. during the assault in his office.[10] The state took it as a given that the Barrow incident had actually been a sexual assault. Worthy contends that the prosecutor relied on that assumption

> to generate sympathy for T.J.S. as a victim of two rapes, to establish her as a truthful reporter of rapes, to show her mental condition as a rape victim, and to portray Mr. Worthy as a man so bad that he raped someone he knew was particularly vulnerable because she had just been raped by someone else.

We agree with Worthy's characterization of the prosecutor's approach.

The state's trial references to the Barrow event had the effect of elevating that incident to a level of importance it would not normally have had.

We are guided here by our opinion in *Davenport*. Davenport was prosecuted for

---

2. See *Hawley v. State*, 614 P.2d 1349, 1361 (Alaska 1980).

3. See *Shane v. Rhines*, 672 P.2d 895, 898 n. 2 (Alaska 1983) ("[E]vidence which is offered to contradict a collateral matter is inadmissible, whether or not the matter was brought out on direct.").

4. 519 P.2d 452 (Alaska 1974).

5. *Id.* at 455.

6. 1 John W. Strong, ed., *McCormick on Evidence* (5th ed.1999) [hereinafter *McCormick on Evidence*].

7. *Id.* § 49, at 203 (footnote omitted).

8. See AS 12.45.045(a).

9. See *Covington v. State*, 703 P.2d 436, 442 (Alaska App.1985), *modified on other grounds on reh'g*, 711 P.2d 1183 (Alaska App.1985). These threshold requirements have not been clearly expressed. *See id.; Johnson v. State*, 889 P.2d 1076, 1078–79 (Alaska App.1995).

10. *See* Appendix.

receiving and concealing stolen property.[11] We approved of the prosecution's request to introduce, for the purpose of impeaching Davenport's testimony that he had never seen a certain gold cuff link before it was pawned, testimony linking the cuff link with defendant's prior burglary conviction.[12] We reached this conclusion because the proposed testimony "went to the essence of the critical transaction," not to a mere collateral matter.[13]

*McCormick on Evidence* recognizes this category of non-collateral matters: "[A] part of the witness's story may be attacked where as a matter of human experience, he could not be mistaken about that fact if the thrust of his testimony on the historical merits was true." [14]

Chris's proposed testimony is similar to the testimony allowed in *Davenport* and fits within the exception recognized by *McCormick on Evidence*. The prosecution chose to use the Barrow event to bolster T.J.S.'s credibility, generate sympathy for her, and tarnish Worthy's image before the jury. The prosecution made the truth of the Barrow rape a critical part of Worthy's assault on T.J.S. For this reason, Worthy was entitled to litigate the truth or falsity of T.J.S.'s Barrow rape report. It was an abuse of discretion to exclude Chris's testimony.

▪ We will not reverse a conviction based on an evidentiary ruling if the error is harmless.[15] Because the state made T.J.S.'s testimony regarding the alleged Barrow event an integral part of its case against Worthy, Chris's testimony might have substantially affected the jury's verdict. Exclusion of this evidence therefore requires reversal of Worthy's conviction and remand for retrial.

▪ Correctly noting that Worthy failed at trial to renew his pretrial request to call Chris, the dissenting opinion reasons that Worthy waived this argument.[16] We decline to hold that Worthy did not preserve the issue.

Our reluctance is partly procedural. The state did not argue waiver in this court in its Brief of Respondent or at oral argument [17] and instead argued the merits of the substantive issue. Had the state raised the waiver issue, Worthy might have persuasively explained in reply or in oral argument why we should not rely on waiver to avoid considering his ostensibly meritorious substantive argument. We could raise the waiver issue sua sponte at our discretion, but we are reluctant to do so where the state's failure to raise the waiver issue was itself a waiver that potentially prejudiced the opponent.

But our reluctance is mostly substantive. Under the circumstances of this case, we are not convinced that Worthy was required to do more than he did to preserve the issue. The defense reasoned before trial that it was important to call Chris to show that the Barrow accusation was false. That reason never changed. Both before and after the state "opened the door" at trial, the truth of T.J.S.'s Barrow accusation was fundamental to the state's use of the incident. But the trial court had already ruled that there would be no attack on the truth of the Barrow accusation through testimony from Chris. Even after the state "opened the door" at trial, the trial court maintained its unwillingness to address the truth of the Barrow accusation. Given the breadth of the trial court's pretrial ruling, and its repeated assertions at trial that it was not going to allow the parties to try the Barrow incident, there is no reason to think the trial court would

11. See *Davenport,* 519 P.2d at 453.

12. See *id.* at 455.

13. *Id.*

14. *McCormick on Evidence* at 203.

15. See Alaska R. Civ. P. 61 ("No error in the admission or the exclusion of evidence ... is

ground for granting a new trial or setting aside a verdict ... unless refusal to take such action appears to the court inconsistent with substantial justice.").

16. Dissent at 777.

17. Nor did the state argue waiver in its appellee brief before the court of appeals or in its response to Worthy's petition for hearing.

have reversed its pretrial ruling had Worthy renewed his request.

Our refusal to raise a waiver issue sua sponte in this case should not be taken to indicate that we are generally willing to consider, absent plain error, appellate arguments not preserved below. Rather, the specific facts of this case and the countervailing preservation problem created by the state's failure to raise the waiver issue lead us to conclude that we should not avoid the substantive issue on a theory that it was not preserved for appellate review.

### B. Reversal Moots Any Error in Excluding Defendant's Expert Witness.

■ Worthy argues that the superior court abused its discretion by prohibiting his expert, Dr. LaGrande, from testifying to rebut the prosecution's case-in-chief.[18] The superior court based its exclusion decision in part on the untimeliness of Worthy's expert witness disclosure.[19] Because the exclusion of Chris's testimony requires reversal and remand for retrial, it is not necessary to decide whether the court abused its discretion in excluding Dr. LaGrande's testimony.

Assuming Worthy is retried, the superior court can revisit the foundation issue in context of the evidence before it at retrial. Worthy will also have an adequate opportunity to make a timely expert witness disclosure before retrial. Because Dr. LaGrande's testimony will necessarily require reference to T.J.S.'s previous sexual conduct, AS 12.45.045(a) and Alaska Evidence Rule 404(a)(2) may affect the admissibility of Dr. LaGrande's testimony. Alaska Evidence Rule 703 also potentially applies. And, as expert testimony, it must meet the require-

ments of Alaska Evidence Rule 702 discussed in State v. Coon.[20]

## IV. CONCLUSION

We REVERSE Worthy's conviction for second-degree sexual assault and REMAND for retrial.

BRYNER and CARPENETI, Justices, not participating.

FABE, Justice, dissenting.

The court bases its reversal of Conrad Worthy's conviction on the fact that the State's references at trial to "Chris" and the alleged Barrow rape incident "had the effect of elevating that incident to a level of importance it would not normally have had."[1] Thus, according to the court, it was the State's conduct during trial in asking questions and making arguments about the Barrow rape that rendered Chris's testimony about the falsity of that rape charge admissible. But the court does not challenge the correctness of the trial judge's pretrial decision to exclude Chris's testimony. And because Worthy never renewed his request to call Chris as a witness during trial on the ground that the State had "opened the door," the trial judge never had an opportunity to consider the theory of admissibility now relied on by the court. I therefore disagree with the court's view that the trial judge committed any error in failing to allow Chris to testify and would affirm the conviction.

In his pre-trial motion, Worthy requested permission to call Chris to testify that T.J.S. had falsely accused him of rape and that T.J.S. had consented to have sex with him. But, as the court properly points out, AS 12.45.045(a) expressly forbids evidence con-

18. See Shepard v. State, 847 P.2d 75, 79 (Alaska App.1993) (vesting trial court with broad discretion to regulate admission of expert testimony and reviewing decision to exclude expert testimony for abuse of discretion).

19. Because Alaska Rule of Criminal Procedure 16(c)(4), which requires the defense to provide notice of experts no later than thirty days prior to trial, did not become effective until after Worthy's trial, the question of what constituted timely notice was committed to the trial court's discretion. See Supreme Court Order No. 1191. Here, the superior court's pretrial order required

the defense to disclose its expert witnesses two weeks before trial. Compliance with a pretrial order is required unless justice demands otherwise. See Alaska R.Crim. P. 22(b) ("[W]hen entered [the pretrial order] shall control the subsequent course of the proceedings, unless modified at the trial to prevent manifest injustice."). Worthy did not comply with the pretrial order as entered.

20. 974 P.2d 386 (Alaska 1999).

1. Op. at 774.

cerning the prior sexual conduct of an alleged sexual assault victim.[2] And as the court of appeals held in *Covington v. State*,[3] prior false allegations of sexual assault are not admissible to discredit the victim's current allegations unless the proponent of the evidence meets the threshold burden of establishing the falsity of the past reports.[4] In *Covington* the court of appeals decided that such evidence would only be permissible "where the charges somehow had been disproved or where the witness had conceded their falsity."[5]

In this case, because Worthy's pre-trial offer of proof did not meet the *Covington* standard, the superior court properly denied his request to call Chris. And the court today does not disagree that the superior court's *Covington* ruling was correct. Thus, on the only occasion when Worthy did request permission to call Chris—before trial began and before the Barrow rape became "independently relevant"[6]—the superior court properly ruled to exclude such testimony. This pre-trial decision to exclude Chris's testimony therefore cannot be a basis for reversal on appeal.

The court excuses Worthy's failure to renew his request to call Chris by reasoning that Worthy's theory of relevance "never changed."[7] But it is the State's conduct in making the Barrow rape incident a "central part" of its case at trial that forms the basis for the court's reversal of the conviction.[8] Because Worthy never made the argument upon which the court now relies, the superior court had no opportunity to reconsider its initial ruling on this theory of admissibility.

The court's opinion implies that because the State opened the door to Chris's testimony, the trial judge should have revised her order sua sponte and invited Worthy to call Chris as a witness. But in the vast majority of trials, the judge will issue some form of protective order precluding the introduction of certain evidence. And it is not unusual for a party to render the previously excluded evidence relevant and admissible by some action of its own during trial. In my view it is not appropriate to hold the trial court responsible for identifying new theories of admissibility and pointing those theories out to the parties during the course of a trial. Indeed, lawyers may have strategic reasons for letting the opportunity to reargue a point pass.

I therefore believe that Worthy waived his argument that the State improperly "opened the door" to the Barrow rape because he did not specifically object to the State's conduct during trial or renew his request to call Chris. And although the court observes that the State did not argue waiver in this appeal,[9] we can affirm on any grounds that are supported by the record.[10]

Moreover, in a case similar to the one before us, the court of appeals properly affirmed the conviction of a defendant who attempted to raise on appeal a new theory for admitting evidence excluded at trial. In *Dyer v. State*,[11] the defendant initially sought to cross-examine a witness concerning the witness's pending criminal charges in order to show bias.[12] The court properly granted a protective order that prevented the defen-

---

**2.** *See* Op. at 774 (citing AS 12.45.045(a) ("In prosecutions for the crimes of sexual assault in any degree, ... evidence of the complaining witness' previous sexual conduct may not be admitted nor may reference be made to it in the presence of the jury....")).

**3.** 703 P.2d 436, 442 (Alaska App.1985).

**4.** *See id.; Johnson v. State*, 889 P.2d 1076, 1078 (Alaska App.1995) (recognizing that "we have consistently held" that a party who wishes to introduce evidence of past false reports of sexual assault "bears the threshold burden of establishing the falsity of the past reports").

**5.** *Covington*, 703 P.2d at 442.

**6.** Op. at 774.

**7.** Op. at 775.

**8.** Op. at 774.

**9.** *See* Op. at 775.

**10.** *See Mackie v. Chizmar*, 965 P.2d 1202, 1207 n. 4 (Alaska 1998); *Dixon v. Dixon*, 747 P.2d 1169, 1175 n. 5 (Alaska 1987).

**11.** 666 P.2d 438 (Alaska App.1983).

**12.** *See id.* at 450.

dant from doing so.[13] But on appeal the defendant argued that he should have been able to introduce the pending charges because the State "placed evidence of [the witness's] character for peacefulness in issue."[14] The defendant never asserted those grounds for admitting the evidence in the trial court, however, nor did he renew his request to cross-examine the witness on the pending charges. The defendant only asked to use the evidence to establish bias, a request that the trial court properly denied.[15] The court of appeals accordingly held that "since no application was made to the trial judge on these [new] grounds, we conclude that [the defendant] may not now argue different grounds for admitting the evidence on appeal."[16] Similarly here, because Worthy never renewed his request to call Chris under the theory that the prosecution had "opened the door," or that the Barrow rape incident had taken on "independent relevance," he should not be allowed to argue those grounds for the first time on appeal.[17]

Because Worthy never renewed his request to call Chris as a witness, the trial court had no opportunity to revisit the issue. Although I do not disagree with the court that the State "opened the door" to evidence of the victim's allegedly false report of the Barrow rape, it was incumbent upon Worthy to renew his request to call Chris. This court will reverse a decision only where the court below commits some error, and in this case, the superior court's only ruling on this matter was proper. In failing to object to the State's conduct, Worthy did not give the trial court an opportunity to remedy the State's conduct in opening the door to details of the Barrow rape incident.[18] For these reasons, I disagree with the court's decision and would affirm the conviction.

## APPENDIX

*References to "Barrow Rape"
by Prosecution*

Prosecution's Opening Statement:

While Mr. Worthy is [sexually assaulting T.J.S.]. He starts saying some very cruel things to her.

[T.J.S.], in April of 1994, was sexually assaulted by a co-worker, while she was working for MarkAir in Barrow. It was a difficult time for her. It was something that stayed with her. It was something that she and Mr. Worthy had talked about. The person that she believed had done that assault on her in Barrow, was a fellow named Chris. [It] wasn't proven at any point in time. It wasn't brought to this stage. But the person was named Chris.

And Mr. Worthy, as he sitting astride of this woman, or lifting her up, he says, "Think of me as Chris. I think this is

13. *See id.*

14. *Id.*

15. *See id.*

16. *Id.* at 451; *see also Jones v. State,* 576 P.2d 997, 1001 (Alaska 1978) ("Having specified a particular purpose for the offer, Jones is not in a position to now claim error because the evidence might have been admissible on other grounds.").

17. *See, e.g., Trobough v. French,* 803 P.2d 384, 385 (Alaska 1990) (where a litigant failed to object to her adversary's conduct during trial and never requested a mistrial, the trial court abused its discretion in granting the new trial because the plaintiff did not "formally object to the questioned acts at the time they were committed"); *Moss v. State,* 620 P.2d 674, 677 (Alaska 1980) (holding that it was "incumbent upon counsel to renew his attempt to obtain the witness' testimony," and that by failing to do so, defendant waived his request); *Petersen v. State,* 838 P.2d 812, 816 (Alaska App.1992) (Bryner, C.J.) (because defendant failed to renew his request for severance, the trial court's failure to order severance sua sponte did not amount to plain error).

18. The purpose of the rule requiring parties to object formally to errors during trial is "to facilitate the administration of justice by permitting the trial judge to obviate any error that might otherwise occur if no objection were made, by permitting him to correct at the earliest possible time any error that may have occurred, and by allowing the adverse party the opportunity to remedy, if possible, any defect in his method of proof." *Harned v. Dura Corp.,* 665 P.2d 5, 9 n. 11 (quoting *Thomson v. Wheeler Constr. Co.,* 385 P.2d 111, 115 (Alaska 1963)); *see also Williams v. State,* 629 P.2d 54, 59 (Alaska 1981) (purpose is "to require errors to be brought to the attention of the trial court in time for their correction so as to avoid the inconvenience and expense of a new trial") (quoting *Dimmick v. State,* 449 P.2d 774, 776 (Alaska 1969)).

what you wanted Chris to do up in Barrow."

He said things to her, to let her know how she ought to feel about this circumstance that she found herself in.

"This is like what Chris did to you."

This is unpleasant to [T.J.S.]. This is hurtful to [T.J.S.].

. . . .

And as things progress, you will also hear that Mr. Worthy not only mentioned, brings up, uses this name of "Chris," and this incident in Barrow, as a means of, at least, verbally assaulting, or somehow communicating what his intention is that morning. He calls her a lot of other names.

. . . .

After she's been called a lot of names. Not necessarily every name in the book, but she's been called a lot of names.

She's been scared by the cruel remarks about the former sexual assault. She's concerned that he is so out of control, that she doesn't know what he is going to do next.

. . . .

In April of '94, a terrible thing happened in Barrow. She was sexually assaulted. It occurred after a party. It was a terrible thing for her. She left the Barrow posting, and was transferred to St. Mary's.

. . . .

After that [telephone conversation between T.J.S. and Worthy following the assault], in which [Worthy] basically says, "It wasn't me, it must have been this Brian guy. Maybe it was Chris. Maybe it was the guy up north. You're havin' [sic] a bad dream about all this stuff."

Prosecution's Direct Examination of Officer Kevin Bradley Mitchell:

[T.J.S.] said ... And while [Worthy] was [sexually assaulting her], she indicated to me that he had made statements to the effect of—while he was doing this he said, "Just think of me as Chris."

[T.J.S.] had indicated at that point that she had been sexually assaulted prior—I'm not sure of the time frame, but I believe it was about a year prior, at the place where she had worked up in Barrow, and that incident was being criminally investigated. But she had come back to Mr. Worthy, her boyfriend, and told him about the incident, and told him what happened, and apparently they had gone through some trauma of that.

And during that incident, while she was being held down and he was inserting his fingers into her vagina, he was telling her, "Just think of me as Chris. Just think of me as Chris," as he was doing that.

Prosecution's Direct Examination of T.J.S.:

Q: You ended that Barrow posting when?

A: April.

Q: Why?

A: Because of an incident with another employee.

Q: Was this a fellow named Chris?

A: Yes.

Q: Was this an incident that was sexual in nature?

A: Yes.

Q: Against your will?

A: Yes.

Q: Investigated by the police?

A: Yes.

Q: You didn't want to work there anymore?

A: No.

Q: Did you continue to work for MarkAir?

A: Yes.

Q: In this incident that involved this fellow named Chris, you said he was a co-worker?

A: Yes.

Q: Was this an incident that involved genital intercourse?

A: Yes.

Q: Any other kind of intercourse or penetration?

A: No.

. . . .

Q: You said you ended up somehow—when you were over by the copy machine, what happened?

 

A: Um, there was some struggle, I was on the floor on my back, um, he was saying things. I was trying to tell him not to do this.... He was still calling me cruel names, and about then is when he started saying things like, "Think of me as Chris."

. . . .

Q: When your pantyhose were ripped, while you were on the floor, you said he was saying things about, "Think of me as Chris?"

A: Yes..

Q: Chris was the fellow that you talked about in Barrow?

A: Yes.

Q: Did you talk to Mr. Worthy about Chris?

A: Yes.

Q: Had you communicated to Mr. Worthy that Chris was an unpleasant memory for you?

A: Yes.

Q: How did you feel when Mr. Worthy said things like, "Think of me as Chris?"

A: Very hurt.

. . . .

Q: At some point did he make actual contact with your genitals?

A: Yes.

Q: How did that come about? Describe that for us?

A: He was holding me down saying the things about Chris, and calling me cruel names, and he had basically, all of me pinned down somehow.

. . . .

Q: Did Mr. Worthy say he wanted you to do anything during this encounter?

A: To think of him as Chris; to use my [self-defense] training. That's the only things I remember.

. . . .

Q: Why weren't you going to report the crime? (Pause)

A: Because—because I didn't want to—(pause)—I didn't really want—I—(pause)—I didn't want to.

Q: Was there anything about your relationship with Mr. Worthy that caused you not to want to?

A: I didn't want him to get into trouble.

. . . .

Q: Had you been through a police investigation in the past?

A: There—at that point, there was still one going on in Barrow.

Q: Was it a pleasant experience for you?

A: No.

Q: Was it something that you thought, "I'll go report this crime, I'm looking forward to nailing him for this?"

A: No.

Q: So you called the police?

A: Yes.

Prosecution's Redirect Examination of T.J.S.:

Q: With regard to the Barrow incident, did you want to be posted in Barrow?

A: Yes. I had been trying to get the position in Barrow for a long time, and I had just started a new job in Anchorage, when I got the news that I go it, I was really happy that I had gone out there.

Q: So then we can understand, this happened after a party with co-workers?

A: Yeah. The way that the shifts work, because we're eight days on, six days off. There is one night that, basically, everybody is there, and so we would get together on that night, over at some friends house and have a couple drinks, and then go home and go to sleep, and some of us would go to work the next day, and some of us would fly back into town, or wherever we were going.

Q: What were you on? Were you going to work the next day, or were you going home?

A: That was my shift, I was going to work.

Q: This fellow, whose name we now know is, Chris. Was he on shift, or was he going home?

A: He was going home.

Q: Do you know when you left this party?

A: I know it was a few hours before everyone else, because I couldn't get a ride at first. (indiscernible—unclear) finally said, "Okay, I'll leave and I'll take you home," probably around midnight, because I like to get enough sleep before I go to work the next day, especially when I'm working a 10–hour day.

Q: And so a few hours later, you are awakened from your sleep?

A: Yes.

Q: Did you share a room with anybody?

A: No.

Q: And this fellow, did he admit to coming into your room?

A: He . . .

Ms. Tatter: Objection. Hearsay.

. . . .

Q: We were talking about what happened in Barrow in April of 1994. Did you tell Mr. Worthy about that?

A: Yes, I did.

Q: Did he know that you were making follow-up telephone calls?

A: Yes, he did.

Q: Did he encourage you on that score?

A: Yeah, I think so.

Q: Did Mr. Worthy take you seriously about what had happened up in Barrow?

(Pause)

A: Sometimes. Most of the time he didn't. Most of the time he said that it was something that I caused—something that I tried to do.

Q: And [T.J.S.], did you tell Mr. Worthy that this was an incident in which you did not consent?

A: Yes, I did.

Q: Did you tell Mr. Worthy, or communicate to Mr. Worthy in any way, that this was some kind of drunken orgy?

A: No.

Q: During the reported conversation with this person named Chris, did he admit being in your room?

A: During the wire he did.

Q: Did you engage in a telephone conversation that was recorded by the police, with Mr. Worthy?

A: Yes, I did.

Prosecution's Closing Argument:

And then finally, ladies and gentlemen, the defendant tells Detective Herrick that they talked about Chris from Barrow. Ladies and gentlemen, this is a real interesting piece of information. Why are we bringing up Chris from barrow if this is not sexual in nature. Everything about Chris from Barrow is sexual.

We hear from Sue Ellen Tatter in opening that they're going to prove that this is a drunken orgy. What we heard from Conrad Worthy was it was a very sad and humiliating and devastating thing for both of them. And "I didn't really understand wasn't pressing it, I didn't understand why she wasn't calling the cops every day, calling the district attorney's office, pressing this home, pressing this home." He wasn't being particularly sensitive to [T.J.S.'s] needs in that situation, but we all acknowledge beyond a shadow of a doubt that that was a sexual assault and he's talking about this as he's doing these things to [T.J.S.].

Ladies and gentlemen, why bring up Chris if you're not talking about sex. If we're not dealing with what the law calls sexual penetration.

. . . .

He admits to Detective Herrick that she was defending herself. He says that his fingers may have gone in her vagina. And you, again, you get to decide whether that can happen inadvertently, especially under the circumstances under which this would admittedly perform. Because he said "I talked about Chris from Barrow and that was a sexual matter."